UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Diana Marie Monarrez, | ) | Case No. 15bk31790 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| The Board of Education of the City of Chicago, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 16ap00004 |
| | ) | |
| v. | ) | Judge Timothy A. Barnes |
| | ) | |
| Diana Marie Monarrez, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | | |

TIMOTHY A. BARNES, Judge.

## MEMORANDUM DECISION

Before the court is the Adversary Complaint [Adv. Dkt. No. 1] (the "Complaint"), filed by the Board of Education of the City of Chicago (the "Plaintiff" or the "Board"), seeking a finding that debt allegedly incurred by Diana Marie Monarrez (the "Debtor") is nondischargeable pursuant to section 523(a)(2) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). Prior to the commencement of her bankruptcy case, the Debtor enrolled three of her children in Chicago Public Schools, where they attended as Chicago residents tuition-free for several years. The debt was allegedly incurred when the Debtor was determined by individuals working for the Board to have been residing outside of the City of Chicago while her children were enrolled in school. As Chicago residency is a condition of attending Chicago Public Schools tuition-free, upon determining the Debtor to be a nonresident, individuals under the Board's employ determined that the Debtor owed a debt of $172,087.93 to the Plaintiff in unpaid tuition.

For the reasons stated herein, the court finds that the Plaintiff failed to carry its burden to demonstrate that collateral estoppel applies, or to prove by a preponderance of the evidence that the Debtor was not a resident of the City of Chicago from 2006 to 2013. As a result, there is no debt owed to the Plaintiff and no cause of action under section 523(a)(2)(A) of the Bankruptcy Code. Even had the Plaintiff carried its burden as to the existence of a debt, the Plaintiff failed to show by a preponderance of the evidence that the Debtor intentionally incurred the debt through false pretenses, false representation, or actual fraud. As a result, the Debtor will not be denied a discharge of the alleged debt.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall*, 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. *See e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The Complaint is based on section 523(a)(2)(A) of the Bankruptcy Code, which provides an exception to discharge for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud. Accordingly, the matter is expressly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). In accordance with *Stern*, 564 U.S. at 499, the bankruptcy court has authority to decide matters of nondischargeability, as the dischargeability of a debt is necessarily a matter that would stem from the bankruptcy itself. "A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability." *Parkway Bank & Tr. v. Casali (In re Casali)*, 526 B.R. 271, 274 (Bankr. N.D. Ill. 2015) (Schmetterer, J.); *see also Wan Ho Indus. Co., Ltd. v. Hemken (In re Hemken)*, 513 B.R. 344, 350 (Bankr. E.D. Wis. 2014). Further, each of the parties has either expressly or impliedly consented to this court's exercising authority over this matter.

As a result, the court has jurisdiction, statutory authority and constitutional authority to hear and enter final judgment on this matter.

BACKGROUND

This case turns on the location of the Debtor's residence from 2006 to 2013. The Debtor grew up in the Pilsen neighborhood of Chicago, in a home she refers to as her "birth home." When she was sixteen and expecting her first child, the Debtor moved into a property (the "Chicago Property") owned by her husband's parents, also in the Pilsen neighborhood. There she lived with her daughters, her husband, and her husband's family until 1999.

In 1999, the Debtor moved with her mother, husband and two children to Mamou, Louisiana. There she lived for two years, working as a school teacher, until better wages enticed her to move back to Chicago in 2001. Upon relocating to Chicago, the Debtor moved back into the Chicago Property, where she claims she continued to reside with her children through 2013. The Debtor appreciated the assistance in child care that she received from her husband's parents and wanted her children to continue to be exposed to the Spanish language at home, an advantage the Chicago Property provided.

Upon moving back to Chicago in 2001, the Debtor obtained a position as a teacher in the Chicago Public Schools. The Debtor testified that she was aware at the time she accepted the position that teachers in the Chicago Public School system are required to reside within the City of Chicago as a term of employment. When she later enrolled three of her children in the Chicago Public School system, she was aware that in order for a student to attend the Chicago Public Schools tuition-free, that student must reside within the City of Chicago.

In 2004, the Debtor, along with her husband, Mr. Monarrez, purchased a home from her sister located in Burbank, Illinois (the "Burbank Property"). The Debtor's sister had filed for bankruptcy and was facing foreclosure on her home. According to the Debtor, the Debtor purchased the Burbank Property in order to help her sister and to provide a location outside of Chicago in which her husband could reside, as the Debtor and Mr. Monarrez had decided to live separately.

The Debtor testified that, due to Mr. Monarrez's ongoing legal and medical difficulties, she believed that the best arrangement for her family would be for Mr. Monarrez to live in the Burbank Property while the Debtor and her children continued to reside in the Chicago Property. The Debtor regularly brought her children to visit their father in Burbank and sometimes slept over at the Burbank Property. The frequency of visits to the Burbank Property fluctuated with the severity of Mr. Monarrez's issues, but for the most part the Debtor maintained a routine of visiting Mr. Monarrez with her children in the later part of the week about every or every other week, and then returning to the Chicago Property on Sunday in preparation for the upcoming school week. This pattern continued until 2009.

In June 2009, while the Debtor and her children were present, the Chicago Police Department conducted a raid of the Burbank Property. The Debtor's relationship with her husband deteriorated further at that point and the Debtor ceased bringing her children to visit Mr. Monarrez. The Debtor testified that she would visit her husband alone, but that she was uncomfortable bringing her children. The Debtor and her children continued to reside in the Chicago Property with Mr. Monarrez's family at this time. As Mr. Monarrez's condition improved, the Debtor and her children resumed visiting Mr. Monarrez in Burbank, spending about four days a month in the

Burbank Property. By 2013, the frequency and length of the family's visits to Burbank had increased significantly.

In 2013, the Board received a tip alleging that the Debtor did not reside in the City of Chicago. The Board directed its Office of the Inspector General (the "OIG") to investigate, which investigation consisted of six observations of the Burbank Property. During these observation periods, investigators from the OIG parked their vehicle outside of the Burbank Property and waited until the Debtor and her children exited the home. They then followed the Debtor as she drove her children to school in the morning. The investigators observed this pattern five of six times that they visited the Burbank Property during the span of several months in 2013.[1]

Following the investigation, the OIG issued an investigative report which concluded that the Debtor was a nonresident of Chicago. On March 7, 2014, a hearing was held which was presided over by a hearing officer, a local attorney hired by the Board. At the hearing, the Debtor and several other witnesses testified, including an investigator from the OIG. Several witnesses testified that the Debtor lived at the Chicago Property, including a neighbor and a friend who had been to parties at the Chicago Property and a co-worker who testified that the Debtor gave her rides to work from the Chicago Property. With few exceptions, virtually all of the evidence presented to the hearing officer except for the investigator's report indicated that the Debtor resided at the Chicago Property. Further, other than the Debtor's presence in Burbank during the 2009 raid and her ownership of the Burbank Property since before the period in question, little or no evidence was offered in support of Debtor residing at the Burbank Property prior to 2013. Despite this, the hearing officer followed the recommendation of the OIG and recommended to the Board that it find that the Debtor had resided with her husband at the Burbank Property since 2006.

The Board appeared to have followed the recommendation of its hearing officer, but as discussed below, that is unclear. Nonetheless, in July 2014, an employee of the Board mailed a notice to the Debtor that the Debtor owed the Board a debt of $172,087.93, representing the cost of schooling her three children from 2006 to 2013.

On September 17, 2015, the Debtor filed for chapter 7 bankruptcy relief, listing the alleged debt due to the Plaintiff.[2] Shortly thereafter, on January 4, 2016, the Plaintiff filed the Complaint.

## PROCEDURAL HISTORY

The court has considered the evidence and arguments presented by the parties at the trial, which took place in this court on June 12 and 13, 2018 (the "Trial"), has reviewed the Complaint, and has reviewed and found each of the following of particular relevance:

(1)     Defendant Diana Marie Monarrez's Answer to Complaint [Adv. Dkt. No. 13];

---

[1]     The investigators made no attempt to observe the Debtor's comings and goings at the Chicago Property.

[2]     The debt is actually listed as being owed to Chicago Public Schools, but the amounts are similar. Despite the Debtor's categorization of the alleged debt, the Plaintiff does not raise any issues with respect to notice or the listing of the debt in the Debtor's schedules. The Plaintiff also filed Claim 1-1 in the Debtor's bankruptcy case on December 31, 2015.

(2)     Plaintiff's Motion for Summary Judgment and Finding of Nondischargeability [Adv. Dkt. No. 37];

(3)     Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and Finding of Nondischargeability [Adv. Dkt. No. 39];

(4)     Plaintiff's Statement of Material Facts as to Which There Are No Genuine Issues [Adv. Dkt. No. 41];

(5)     Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Are No Genuine Issues [Adv. Dkt. No. 46];

(6)     Defendant's Statement of Material Facts as to Which There Are No Genuine Issues [Adv. Dkt. No. 47];

(7)     Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment [Adv. Dkt. No. 48];

(8)     Plaintiff's Reply in Support of Its Motion for Summary Judgment [Adv. Dkt. No. 52];

(9)     Diana Monarrez's First Set of Requests to Admit [Adv. Dkt. No. 63] (the "Debtor's First RTA");

(10)    Final Pretrial Order Governing Adversary Complaint [Adv. Dkt. No. 68] (the "Pretrial Order");

(11)    Diana Monarrez's Amended Pretrial Statement [Adv. Dkt. No. 81];

(12)    Plaintiff's Pretrial Statement [Adv. Dkt. No. 82];

(13)    Defendant's Motion for Summary Judgment [Adv. Dkt. No. 84];

(14)    Defendant's Statement of Material Facts as to Which There Are No Genuine Issues [Adv. Dkt. No. 85];

(15)    Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment [Adv. Dkt. No. 86];

(16)    Plaintiff's Motion to Withdraw Admission and Memorandum in Support [Adv. Dkt. No. 90];

(17)    Defendant's Brief in Opposition to Plaintiff's Amended Motion to Withdraw Admission [Adv. Dkt. No. 94];

(18)    Plaintiff's Local Rule 7056-2(A)(1) Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [Adv. Dkt. No. 95];

(19)    Plaintiff's Local Rule 7056-2(A)(2) Response to Defendant's Statement of Material Facts [Adv. Dkt. No. 96];

(20)    Defendant's Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment [Adv. Dkt. No. 99];

(21)    Plaintiff's Reply Brief in Support of Its Amended Motion to Withdraw Admission [Adv. Dkt. No. 100];

(22)    Defendant's Written Closing Argument [Adv. Dkt. No. 109]; and

(23)    [Plaintiff's] Closing Arguments [Adv. Dkt. No. 110].

The court has also taken into consideration all exhibits submitted along with the documents listed, and, as this is not an exhaustive list of the filings submitted in this case, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same).

## EVIDENTIARY RULINGS

The Pretrial Order entered in this matter stated that objections to an exhibit not raised in pretrial statement(s) would be waived. As a result, both parties objected to exhibits in their pretrial statements. These objections were heard at the Trial.[3]

A.    Debtor's Motions *in Limine*

In the Plaintiff's Pretrial Statement, the Plaintiff indicated that it would put forth four witnesses and 41 exhibits. In the Debtor's Pretrial Statement, the Debtor did not object to any of the Plaintiff's witnesses, but did object to all of the Plaintiff's exhibits on the basis of foundation, relevance, hearsay and other potential violations of the Federal Rules of Evidence, including speculation, legal conclusion and impermissible opinion.

In a bench trial, objections on the basis of relevance rarely warrant the exclusion of evidence. "In the bankruptcy court, the bankruptcy judge is the fact finder." *In re Kenneth Leventhal & Co.*, 19 F.3d 1174, 1178 (7th Cir. 1994). Consequently, a court may "admit evidence of borderline admissibility and give it the (slight) weight to which it is entitled." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003). Accordingly, the court did not exclude any evidence at the outset of the Trial on the basis of relevance.

The Debtor specifically objected to Plaintiff's Exhibit Nos. 7, 18, 22, 23, 24, 35, 36, 38, 39 and 41 on the basis that they were not produced in accordance with the Debtor's First Request to Produce Documents. Number nine of the Debtor's First Request to Produce Documents requests

---

[3]    While the Pretrial Order stated that all exhibits to which no objections were raised in the pretrial statements would be admitted into evidence, the court stated at the Trial that any exhibit that was not referenced during the course of the Trial or in the parties' closing statements would be awarded a weight of zero. The Debtor included several exhibits in her pretrial statement which were never referenced by either party, during the Trial or in closing statements. Accordingly, as the court has at no point been given any explanation of their relevance, such exhibits are afforded no weight and are not discussed in this Memorandum Decision.

that the Plaintiff "produce any and all investigative reports prepared by Plaintiff or its agent that relate to Debtor's address," and number ten of the same request reads, "produce any and all statements or other documents you may offer into evidence at trial." Tr. at p. 243, June 12, 2018.

Plaintiff's Exhibit No. 7 was an email from a school employee to the Debtor regarding the investigation of the Debtor's residency. The court determined that because the document had not been provided when requested, the Debtor did not have the opportunity to prepare for its presentation at the Trial and would be prejudiced by its inclusion. Consequently, the court sustained the Debtor's objection and excluded Plaintiff's Exhibit No. 7.

Plaintiff's Exhibit No. 18 was the Cook County Treasurer's Office records of property tax exemption history for the Burbank Property for the years from 2011 to 2015. That exhibit was provided in support of the Plaintiff's earlier motion for summary judgment. The court found that, as a result, the Debtor should have been aware of its existence and possible introduction at the Trial and that the Debtor was therefore not prejudiced by the Plaintiff's failure to produce it in response to the Debtor's earlier document request. The court overruled the Debtor's objection to Plaintiff's Exhibit No. 18.

Plaintiff's Exhibit No. 22 was a collection of vehicle registration records. The Debtor objected to the exhibit's admission into evidence on the basis that the exhibit was not produced in accordance with number ten of the Debtor's First Request to Product Documents. The Plaintiff argued that the Debtor is not prejudiced by the late disclosure of the exhibit because it was used in the underlying administrative hearing, and the Debtor was aware of its existence. The court agreed with the Plaintiff that the Debtor suffered no prejudice from the Plaintiff's failure to produce Exhibit No. 22 in connection with the Debtor's request to produce.

The Debtor also objected to Plaintiff's Exhibit No. 22 on the basis that the Plaintiff admitted by default that the Illinois Secretary of State indicated that the Debtor resided at the Chicago Property. The Plaintiff failed to respond to the Debtor's First RTA, and thereby admitted the contents of the request by default.[4] Paragraph seven of the Debtor's First RTA, states, "[a]dmit that the records of the Illinois Secretary of State indicate that Diana Monarrez resided at 1504 W. 19th Street in Chicago, IL…." [Adv. Dkt. No. 63]. The Debtor claimed that the Plaintiff should not be allowed to introduce evidence that contradicted the admission. The Plaintiff argued that just because the Illinois Secretary of State had indicated something in one document did not disallow the Illinois Secretary of State from indicating something else in another document, mainly the vehicle registration records at issue. Consequently, the Plaintiff's admission by default did not prevent the Plaintiff from putting forth evidence that the Illinois Secretary of State had indicated that the Debtor resided in Burbank in another document. The court agrees that the Plaintiff's default admission to paragraph seven of the Debtor's First RTA does not prevent the Plaintiff from putting forth Plaintiff's Exhibit No. 22. Accordingly, the Debtor's objection was overruled.

---

[4]    The court subsequently granted the Plaintiff's Request to Withdraw Admission, *see* Order Granting Plaintiff's Motion to Withdraw Admission [Adv. Dkt. No. 101], on the grounds that the admission by default would prevent the case from being heard on its merits and that allowing the withdrawal of the admission would not be prejudicial to the Debtor. The Plaintiff, however, only requested that the first admission be withdrawn, and all other admissions were deemed admitted. *See* Fed. R. Civ. P. 36(a)(3), made applicable to adversary proceedings by Fed. R. Bankr. P. 7036.

While the Debtor had objected to Plaintiff's Exhibit No. 23, the Plaintiff ultimately withdrew the exhibit, negating the need to assess its admissibility.

The Debtor also objected to Plaintiff's Exhibit No. 24, City of Chicago Parking Ticket Records for Vehicles Registered to Mr. Monarrez and the Debtor. Once again, the basis was that the Plaintiff was asked in the Debtor's First Request to Produce Documents, numbers nine and ten, to produce any documents prepared by the Plaintiff relating to the Debtor's addresses and any documents that the Plaintiff may offer into evidence at the Trial. The court found that the Debtor would be prejudiced by the inclusion of the records as she was unaware of the Plaintiff's intention to use the document at the Trial until substantially after she had requested such information. Consequently, the court sustained the Debtor's objection and excluded Plaintiff's Exhibit No. 24.

Plaintiff's Exhibit No. 35, titled "'Fall into Fitness Run' Results dates September 23, 2012," appears to be a webpage that the Plaintiff's attorney discovered by searching online. The document includes persons with the same names as the Debtor and one of her children and lists their addresses as being in Burbank, Illinois. The Plaintiff could not explain how it would lay the foundation for the document and the court determined that Plaintiff's Exhibit No. 35 was more prejudicial than probative. The court sustained the Debtor's objection and excluded the exhibit.

Plaintiff's Exhibit No. 36 is a screen shot of a Facebook page of one of the Debtor's daughters. The Debtor objected to the admission of the document on the grounds that the document was not timely disclosed. However, the Plaintiff claimed that it planned to use the document for impeachment purposes only and, therefore, the court declined to exclude the document as a preliminary matter, reserving on the issue until the exhibit was in fact used.

Despite the Plaintiff's stated limitation, the Plaintiff attempted to put forth Plaintiff's Exhibit No. 36 as primary evidence; in accordance with the Plaintiff's earlier limitation, the Court did not allow the Plaintiff to do so. While the court would have allowed the Plaintiff to use its Exhibit No. 36 to impeach a witness, it was never used as such and, therefore, was not considered relevant by the court.

The Plaintiff withdrew its Exhibit No. 38, Comprehensive Reports from Transunion and Lexis Nexis for the Debtor's sister, and Exhibit No. 39, Sprint Wireless Utility Bill Records dated March 15, 2012. Plaintiff's Exhibit No. 41, the docket and petition for bankruptcy of a third party, was withdrawn as primary evidence but was reserved to potentially impeach a witness. The exhibit was not used at the Trial.

The Plaintiff also requested that the Debtor rescind her objections with respect to Plaintiff's Exhibit Nos. 29, 32 and 33 as the Debtor has also offered those documents as the Debtor's Exhibits. The Debtor did so.

The court declined to rule on the Debtor's blanket objection to the remainder of the Plaintiff's Exhibits based on foundation and hearsay at the beginning of the Trial. The court indicated that such rulings could be made if the Exhibits were proffered for use in the Trial and if those objections were then voiced. Tr. at p. 11, June 12, 2018. These objections encompass Plaintiff's Exhibit Nos. 3, 4 and 5 and, as discussed below, the issues with those exhibits go to the heart of the Plaintiff's request to have collateral estoppel apply in this matter.

B.    Plaintiff's Motions *in Limine*

The Debtor put forth three witnesses and 25 exhibits. The Plaintiff objected to the Debtor's Exhibit Nos. 1, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23 and 24 on the basis on inadequate foundation. The Plaintiff further objected to Debtor's Exhibit Nos. 15, 16, 17 and 18 on the basis of hearsay and to Debtor's Exhibit Nos. 8, 16, 20, 21, 22 and 23 on the basis of relevance.

The Debtor's First RTA asked the Plaintiff to admit that Debtor's Exhibit Nos. 1 to 23 were genuine, true and accurate copies of what they purported to be. Because the Plaintiff did not respond to this request, *see supra note 4*, the Plaintiff's objections on the basis of inadequate foundation were not well taken as the foundation of these exhibits were admitted by default. Debtor's Exhibit No. 24 was not proffered at the Trial by either party and therefore the court gives it no evidentiary weight. *See supra note 3.*

As with the Debtor's blanket objection based on hearsay, the court only ruled on hearsay evidentiary objections if and when raised in the Trial. Tr. at p. 11, June 12, 2018. The Plaintiff voiced no hearsay objections to any of the Debtor's Exhibits at the Trial and, therefore, none of the Debtor's Exhibits were excluded on this basis.

Any objection with respect to relevance remains the same as previously discussed. As a result, the court declined to exclude any of the Debtor's Exhibits at the outset of the Trial on the basis of foundation, relevance or hearsay.

## FINDINGS OF FACT[5]

From the review and consideration of the procedural background, as well as the evidence presented at the Trial, the court determines the salient facts to be and so finds as follows:

a)    The Debtor is the custodial parent of four children, three of whom attended Chicago Public Schools at some point during the period from 2006 to 2013. PX No. 4.

b)    The Debtor moved into the Chicago Property for the first time at age sixteen while expecting her first child with Mr. Monarrez. The Chicago Property was owned by Mr. Monarrez's parents and she lived there with Mr. Monarrez, his parents, his sister and brother-in-law and their three children. Tr. at pp. 223-28, June 13, 2018.

c)    In 1999, the Debtor moved to Mamou, Louisiana with her mother, Mr. Monarrez and their two children, along with her nephew. *Id.* at pp. 229-32.

d)    The Debtor moved from Mamou, Louisiana to Chicago, Illinois in 2001, at which time she moved back into the Chicago Property. *Id.* at pp. 236-41.

e)    On March 4, 2004, the Debtor, along with her husband, purchased the Burbank Property from her sister. *Id.* at p. 243.

---

[5]    To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. Adjudicative facts may also be found and determined later in this Memorandum Decision.

f) The Debtor's husband moved into the Burbank Property while the Debtor and her children continued to reside in the Chicago Property. *Id.* at pp. 244-45.

g) The Debtor listed the Chicago Property as her residence on her taxes for the years 2002, 2006, 2007, 2008, 2009, 2010 and 2013. DX No. 2.

h) The Debtor continued to list the Chicago Property as her place of residence for the purpose of banking through the year 2013. DX No. 10.

i) The Debtor, along with her children, visited her husband at the Burbank Property with varying frequency between 2004 and 2013, depending on the status of her husband's health and the state of their marriage. The Debtor kept her and her children's clothing at the Chicago Property, along with toys, bicycles and school supplies, and did laundry for herself and her children at the Chicago Property. Tr. at pp. 277-79, June 13, 2018.

j) The Chicago Police Department raided the Burbank Property in June 2009. The Debtor and her children were present, along with the Debtor's niece. *Id.* at pp. 273-74.

k) The Debtor and her children visited the Burbank Property less frequently after the raid occurred. *Id.* at p. 275.

l) After receiving a tip that the Debtor did not reside in the City of Chicago, the Plaintiff instructed its OIG to investigate the Debtor for residency and tuition fraud. *Id.* at pp. 161-62.

m) An investigator for the OIG conducted six surveillances of the Burbank Property, all during 2013, and no surveillances of the Chicago Property. The Debtor was present in five of the six observations. PX No. 8.

n) The OIG also conducted an interview with the Debtor on November 14, 2013. *Id.*; Tr. at p. 164, June 12, 2018.

o) The OIG determined that the Debtor resided in Burbank, Illinois and not in Chicago, Illinois. Compl., Exh. A; PX No. 3.

p) The Debtor received a letter outlining the allegations against her. Compl., Exh. A; PX No. 3.

q) A hearing officer conducted a hearing on March 7, 2014. Compl., Exh. A; PX No. 3.

r) The hearing officer recommended that the Board find that the Debtor and her husband were not residents of the City of Chicago. Compl., Exh. A; PX No. 3.

s) The Debtor received a letter from an employee of the Board informing her that her children had been found to be nonresidents of the City of Chicago, and that she was being charged $172,087.93 in unpaid tuition. Compl., Exh. C; PX No. 5.

DISCUSSION

The Complaint includes only one count, which count asserts a claim under section 523(a)(2) of the Bankruptcy Code in relation to an alleged debt for out of district school attendance by the Debtor's children.

The matter is complicated by the Plaintiff's assertion that collateral estoppel should apply to several facts of the case. Accordingly, the court will first address whether collateral estoppel is appropriate, before turning towards an analysis of section 523(a)(2), wherein the court will discuss two necessary elements to a finding on nondischargeability: (a) the existence of a debt; and (b) the intention to obtain the debt through false pretenses, false representation, or actual fraud.

A.      Collateral Estoppel

The Debtor maintains that, as she never resided at the Burbank Property, she cannot owe a debt in the nature alleged by the Plaintiff. The Plaintiff responds first by arguing that the court should be collaterally estopped from deciding the residency of the Debtor on the grounds that the matter was previously litigated in front of a hearing officer employed by the Plaintiff. In the alternative, the Plaintiff argues that the court should determine that the Debtor does in fact reside at the Burbank Property.

The Plaintiff's assertion of collateral estoppel raises the complicated question of preclusion from agency decisions as applied in later federal court actions. To understand the question, it is helpful to first understand what collateral estoppel, the theory invoked by the Plaintiff, is.

Collateral estoppel, also known as issue preclusion, is an equitable doctrine. "When properly applied, collateral estoppel, also referred to as issue preclusion, promotes fairness and judicial economy by preventing the relitigation of issues that have already been resolved in earlier actions." *DuPage Forklift Serv., Inc. v. Material Handling Servs., Inc.*, 744 N.E.2d 845, 849 (Ill. 2001); *see also Gambino v. Koonce*, 757 F.3d 604, 608 (7th Cir. 2014) (where a prior judgment was issued by a state court, the collateral estoppel of that state governs); *accord Marrese v. American Academy of Orthopedic Surgeons*, 470 U.S. 373, 380 (1985). It also applies to prevent the relitigation of issues in bankruptcy matters. *Adams v. Adams*, 738 F.3d 861, 865 (7th Cir. 2013). As the Seventh Circuit has noted, "[e]ven when the technical conditions of the doctrine are met, collateral estoppel must not be applied to preclude an issue 'unless it is clear that no unfairness results to the party being estopped.'" *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1023 (7th Cir. 2006) (*citing to Talarico v. Dunlap*, 685 N.E.2d 325, 328 (Ill. 1997)).

Those technical conditions are that "(1) the issues decided in the prior adjudication are identical with issues presented for adjudication in the current proceeding; (2) there be a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party or in privity with a party in the prior action." *Kalush v. Deluxe Corp.*, 171 F.3d 489, 493 (7th Cir. 1999). "Under Illinois law, collateral estoppel does not bar relitigation of an issue if the party against whom the doctrine is asserted was denied a full and fair opportunity to litigate the question in the previous case." *Brown v. City of Chicago*, 599 F.3d 772, 775 (7th Cir. 2010). Further, the matter for which estoppel is sought must have been necessary to the underlying determination. *Am. Family Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000).

Collateral estoppel is subject to waiver, *Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009), and here the matter has proceeded to Trial on the very issue on which the Plaintiff seeks estoppel—the Debtor's residency. Because, however, the Plaintiff raised this issue early and often and because the matter remained unresolved at the time of the Trial, the application of collateral estoppel to this issue has not been waived.

That does not mean, however, that the Plaintiff's invocation of collateral estoppel succeeds. As a claimant, the Plaintiff in this matter and the party asserting collateral estoppel against the Debtor, the Plaintiff carries each of the burdens applicable here. *See, e.g., In re Carlson*, 126 F.3d 915, 921 (7th Cir. 1997) (claimant bears the ultimate burden of proof); *Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016) ("The objecting creditor bears the burden of proving by a preponderance of the evidence that an exception to discharge applies."); *Kulavic v. Chicago & Ill. Midland Ry. Co.*, 1 F.3d 507, 517 n. 6 (7th Cir. 1993) (party asserting collateral estoppel bears the burden of establishing that its elements are met).

Despite the Debtor's contentions to the contrary, the court cannot conclude that the Debtor was denied a full opportunity to be heard, including having the assistance of counsel, in the previous proceedings. While those proceedings appear to have been unfair in the sense that the hearing officer failed in the face of conflicting evidence to inquire into the Debtor's intent regarding her residence (a required element under Illinois law),[6] made unsubstantiated and shockingly ethnocentric conclusions regarding the Debtor's living conditions and extrapolated those conclusions over a period of time for which the evidence was, at best, scant—it is difficult for the court to conclude that the proceedings were unfair as far as the standards of collateral estoppel. To hold otherwise would put the court in the position of reviewing the conclusion below on its merits, a role that—at least if the proceedings below were judicial—would be prohibited by numerous federal doctrines. *See, e.g., Rooker v. Fid. Trust Co.*, 263 U.S. 413, 416 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983) (together holding that federal courts do not have subject-matter jurisdiction to act as the reviewing court for state court decisions).

What remains in this context are the questions of whether residence was necessarily determined and whether any of the determinations of individuals in the employ of the Board should count as a prior adjudication.

As to the former, at least as far as the question of residency, it appears that that issue was "litigated" and was necessarily determined. The hearing officer's report, *see* PX No. 3, makes clear that residency was the sole focus of her inquiry, as do the notice of determination and the recommendation to the Board. *See* PX Nos. 5, 4. Per the Illinois School Code, 105 ILCS 5/ *et seq.* (the "School Code"), the sole determination relevant to a finding of indebtedness is residency. That can be done by determining the residency of the student, 105 ILCS 5/10-20.12b, including by extrapolating from the residency of an adult deemed to have legal custody of the student. *Id.* at 5/10-20.12b(a)(1). Collateral estoppel is, after all, issue preclusion. *DuPage Forklift*, 744 N.E.2d at

---

[6]    *Miller v. Police Bd., City of Chicago*, 349 N.E.2d 544, 547 (Ill. App. Ct. 1976) ("In order to have one's residence in a certain place one must both establish a physical presence there *and have the intent to make that location his permanent residence.*") (emphasis added). The hearing officer was required under Illinois law, therefore, to determine which of the two properties the Debtor intended to make her permanent residence. The record is devoid of any such determination.

849.  The court cannot conclude that the issue of residency was not addressed and determined.  If issue preclusion applies, residency would appear to be precluded.

This begs the latter question:  Does preclusion apply in this situation?  As stated at the outset, this is a harder question because of the nature of the proceedings below.  It is also made more difficult by the incompleteness of the record provided to the court.

The nature of the proceedings below calls into question the application of collateral estoppel.  Below, the Debtor was accused, heard and found to owe a debt—all by those working for the party to whom the indebtedness was ultimately determined to be owed.  That situation begs for judicial review.  Had such review taken place, the application of collateral estoppel would be much more straightforward.  *See Fed. Trade Comm'n v. Ruberoid Co.*, 343 U.S. 470, 476 (1952).  No such review was had.

Still, unreviewed factual determinations of qualifying agencies may have preclusive effect.  *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986) ("*Utah Construction* … teaches that giving preclusive effect to administrative factfinding serves the value underlying general principles of collateral estoppel: enforcing repose.") (*citing to United States v. Utah Constr. & Mining Co.*, 384 U.S. 394 (1966)).  "Having federal courts give preclusive effect to the factfinding of state administrative tribunals also serves the value of federalism." *Id.* at 799.

For that to happen, the agency must have been "'acting in an adjudicatory, judicial or quasi-judicial capacity and the disputed issue is identical to the issue presented in the new claim.'" *Allison W. v. Oak Park & River Forest High Sch. Dist. #200*, 193 F. Supp. 3d 894, 898 (N.D. Ill. 2016) (*quoting Gallaher v. Hasbrouk*, 3 N.E.3d 913, 923 (Ill. App. Ct. 2013)); *Rekhi v. Wildwood Indus., Inc.*, 61 F.3d 1313, 1319 (7th Cir. 1995) ("Illinois gives preclusive effect only to determinations made in adjudicatory proceedings, whether judicial or administrative ….").  Further, only the final decisions of such agencies are entitled to preclusive effect.  *Goodwin v. Bd. of Trs. of the Univ. of Ill.*, 442 F.3d 611 (7th. Cir. 2006); *Roberts v. Bd. of Educ.*, 48 F. Supp. 2d 1098 (N.D. Ill. 1999).

Each of *Goodwin* and *Roberts* stands for the principle that boards of education may act with the requisite adjudicatory, judicial or quasi-judicial capacity when making determinations of residency.  *Goodwin*, 442 F.3d at 621; *Roberts*, 48 F. Supp. 2d at 1101.  They also, however, stand for the proposition that it is the board's determination, not the hearing officer's, which is entitled to preclusive effect.  *Goodwin*, 442 F.3d at 620; *Roberts*, 48 F. Supp. 2d at 1101.

Counsel for the Plaintiff repeatedly referred to the hearing officer as an administrative law judge.  However, a hearing officer is not an administrative law judge.  *Schweiker v. McClure*, 456 U.S. 188, 198-200 (1982).  Under Illinois law, the hearing officer only makes recommendations to a board.  It is the board's determination that is the final one.  *See* 105 ILCS 5/10-20.12b(c-5) ("the decision of the board shall be final").  As a result, the determination of the hearing officer is not a final finding to which collateral estoppel may apply.  *Goodwin*, 442 F.3d at 621 ("a hearing officer's findings of fact cannot constitute a final decision"); *Roberts*, 48 F. Supp. 2d at 1101 (same).

As such, it is the Board's decision, if any, that is entitled to collateral estoppel consideration in this case.  Here is where the Plaintiff finally fails.  Keep in mind that the Plaintiff, as the party claiming collateral estoppel, bears the burdens in relation thereto.  For the purposes of collateral estoppel, that means at the very least providing the Board's actual, final holding or adequately

13

explaining how those documents that were tendered may be amalgamated into such a final decision. The Plaintiff has failed to do so.

The Plaintiff provides three separate documents in this regard: The hearing officer's report, PX No. 3; the recommendation to the Board by the Board's chief executive officer, PX No. 4; and the notice to the Debtor of determination, PX No. 5. None of these is the Board's determination itself. The hearing officer's report, as noted above, is not the determination of the Board. It is a recommendation to the Board. For similar reasons, the recommendation to the Board by the Board's chief executive officer, PX No. 4, is not the determination, though referred to as such by the Plaintiff in its Pretrial Statement. *See* Plaintiff's Pretrial Statement [Adv. Dkt. No. 82], at p. 13 (referring to PX No. 4 as "Board's Adoption of Final Determination of Non-residency dated June 25, 2014").

That letter, as does the hearing officer's report, states that it is a recommendation to the Board and clearly recommendations are not actual findings. *See* PX No. 4, at p.1 ("The Chief Executive Officer *recommends* the following ....") (emphasis added). True, there exists one reference within the recommendation that appears to state that "[t]he Board's findings are being adopted ...," but that does not undo the clear recommendation nature of the document. In addition, while it is signed by the Board's chief executive officer, given the captioning of the document and couching of the phrasing as her recommendation, that cannot be interpreted as being an acceptance by the Board. Last, it is also signed by the general counsel of the Board, but only in the capacity of approving the legality of the form. *Id.* at p. 2.

That leaves the notice sent to the Debtor of determination, PX No. 5. That notice is the closest to a determination by the Board itself, but still purports to be something other than the determination. It is a letter from the director of student adjudication of the Board to the Debtor, which states that "the Board of Education of the City of Chicago ... *has determined* that ...." *Id.* at p. 1 (emphasis added). The emphasized language bears the attributes of a description of the Board's finding, not a finding itself. In addition, it clearly states that "Board Report 14-0625-EX22 setting forth the Board's determination is enclosed for your reference." *Id.* Attached as the referenced report is, however, the recommendation and hearing officer's report, each of which are recommendations, not Board determinations. No determination of the Board itself is attached.

Of course, it may be the case that this is all that the Plaintiff does in these situations and certainly these appear to be technical insufficiencies. But if that is the case, why was that not explained to the court? When a party bears the burden of proof, as does the Plaintiff here, holding that party to the standard means that technical insufficiencies are meaningful, especially where exceptions to discharge are to be construed narrowly.

The failure to connect the dots is particularly meaningful given the differences between the documents. For example, the hearing officer discussed both the residency of the children and the parents but recommended only that the parents be deemed to reside outside the City of Chicago. PX No. 3, at p. 8. In the same vein, the recommendation from the Board's chief executive officer is that the Board determine that the parents resided outside of Chicago. PX No. 4, at p. 1. The notice, however, states that the "Board of Education of the City of Chicago ... has determined that *your children* ... were non-residents ...." PX No. 5, at p. 1 (emphasis added). Assuming *arguendo* that the Board did in fact make such a determination, was it based on the facts discussed by the hearing officer independently or is it the letter writer applying the cited legal authority, 105 ILCS 5/10-

20.12b(a)(1), to a finding of the parents' residency? Estoppel, if it applies at all, stems from the Board's final decision, not the wording of a description of that decision. As the issue precluded, if at all, is the one finally determined by the Board, the precise determination must be provided to ascertain that. It was not.

As noted above, the Debtor objected to the admission of these exhibits for a variety of reasons including foundation and has stressed, including in her final statement, *see* Defendant's Written Closing Argument [Adv. Dkt. No. 109], at pp. 13-14, the Plaintiff's failure to provide an actual final determination or proof that the Plaintiff had followed the requirements of the School Code. The Plaintiff, in turn, called no witness capable of authenticating these documents or testifying as to what process actually took place at the Board level. The Debtor is correct in its objection.

As a result, the court cannot conclude that the issue of residency was finally determined by the Plaintiff. For the same reason, the court cannot conclude that a debt exists as a matter of law, without first determining if the Debtor did in fact reside outside of the City of Chicago.

Last, it must be noted that even if the court were collaterally estopped from determining the Debtor's place of residence, the court would not be estopped regarding intent. The Plaintiff argues that the Debtor's intent is also precluded, relying solely to the hearing officer's assertion that the Debtor was not a credible witness as a finding by the hearing officer that the Debtor intentionally misrepresented her address to the Board. However, the hearing officer's findings are not entitled to collateral estoppel effect, as discussed above. Further, any determination of credibility by the hearing officer is not a determination of intent. Last, intent is not an element of a finding under 105 ILCS 5/10-20.12b, except perhaps as to misdemeanor provisions not applied here. *See, e.g.*, 105 ILCS 5/10-20.12b(e), (f). Intent was therefore not necessarily determined and is not entitled to collateral estoppel effect.

The foregoing does not mean, however, that the Debtor succeeds. As the claimant and party seeking a finding of nondischargeability, the Plaintiff might still independently prove the existence of the debt and that the debt arises out of intentional misconduct. The court considers those issues next.

B.   Nondischargeability

As noted above, the Complaint is comprised of only one count, which count asserts a claim under section 523(a)(2) of the Bankruptcy Code in relation to an alleged debt for out of district school attendance by the Debtor's children. While the Plaintiff did not specify in the Complaint which subsection of section 523(a)(2) applied, the allegations raised in the Complaint, if true, support relief under section 523(a)(2)(A). As a result, the court will consider the elements of section 523(a)(2)(A) when assessing the merits of the case.

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Harris, N.A. v. Gunsteen (In re Gunsteen)*, 487 B.R. 887, 899 (Bankr. N.D. Ill. 2013) (Schmetterer, J.). A plaintiff must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). To further the policy of providing a debtor a fresh start, exceptions to the discharge of a debt are to

be construed *strictly* against a creditor and *liberally* in favor of a debtor. *See In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998); *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994).

Section 523 enumerates specific, limited exceptions to the dischargeability of debts. Section 523(a)(2)(A) provides, in relevant part, that an individual debtor is not discharged from any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition….

11 U.S.C. § 523(a)(2)(A).

In order for section 523 to apply, first, a Plaintiff must establish that the debtor owes him a debt. *See Zirkel v. Tomlinson (In re Tomlinson)*, Adv. Case. No. 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999) (Katz, J.). Second, a Plaintiff must show that the debt falls within one of the specified grounds under section 523(a)(2)(A). *Wachovia Secs., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 668 (Bankr. N.D. Ill. 2010) (Goldgar, J.). Three separate grounds for holding a debt to be nondischargeable are included under section 523(a)(2)(A)—false pretenses, false representation, or actual fraud. *Id.*; *see also Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010) (Squires, J.) (*citing Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001) (Schmetterer, J.)). A *required* element of each of the grounds is a finding that the debtor acted with deceptive intent. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 673 (7th Cir. 1995), *cert. denied*, 516 U.S. 1008 (1995); *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006) (Schwartz, J.).

The Complaint therefore cannot succeed unless the Plaintiff carries its burdens of showing that the Debtor owes the underlying debt and the Debtor acted with the requisite intent. The court will consider each in turn.

a.  *Does the Debtor Owe a Debt to the Plaintiff?*

In the case at bar, the Plaintiff asserts that the Debtor owes the Plaintiff an obligation under the School Code, which permits that the cost of tuition be assessed against the parents of nonresident public school attendees. 105 ILCS 5/10-20.12b. The essential element of such a determination is that the parent or other person with custody of the student was not a resident of the school district at the time of the student's attendance of the school.[7]

Under the School Code, "the residence of a person who has legal custody of a pupil is deemed to be the residence of the pupil." 105 ILCS 5/10-20.12b(a)1. "Except as otherwise provided under Section 10-22.5a, only resident pupils of a school district may attend the schools of

---

[7]    Given that the Plaintiff has failed to provide a final determination that satisfies the purpose of collateral estoppel, it could be argued that no debt can be established as, for the debt to arise under the School Code, that debt must be finally determined by the applicable board of education. 105 ILCS 5/10-20.12b(c-5). That argument was not advanced here. As a result, the court assumes for these purposes that the debt may be established in the absence of there being an actual, final determination by the Board.

the district without payment for the tuition required to be charged under section 10-20.12a." *Id.* at 12b(b).

The Illinois courts "have long held *intent* to be the critical question in determining residence, and in determining intent a person's acts are to be given more weight than his declarations." *Connelly by Connelly v. Gibbs*, 445 N.E.2d 477, 480 (Ill. App. Ct. 1983) (emphasis added). In order to establish residency, two elements must be met: (1) the person must have a physical presence in the location; and (2) the person must have the intent to make that location a permanent residence. *Miller*, 349 N.E.2d at 548. Due to the permanence requirement of the residency standard, a person cannot have two residences. *Mina ex rel. Anghel v. Bd. of Educ. for Homewood-Flossmoor*, 809 N.E.2d 168, 175 (Ill. App. Ct. 2004). "A person's residence is the place where a person lives and has his true, permanent home, to which, whenever he is absent, he has an intention of returning." *Fedanzo v. City of Chicago*, 775 N.E.2d 26, 35 (Ill. App. Ct. 2002).

This is true generally, but also is a factor when a person changes his or her location. "When a legal residence is established, a temporary departure therefrom with intention to retain that residence and to return to it is not an abandonment or forfeiture of that residence." *Hughes v. Ill. Pub. Aid Comm'n*, 118 N.E.2d 14, 17 (Ill. 1954). In accordance with this principle, "once a residence has been established the presumption is that it continues, and the burden of proof is on the party claiming that it has been changed." *Maksym v. Bd. of Election Comm'rs of the City of Chicago*, 950 N.E.2d 1051, 1065 (Ill. 2011). In situations in which the parent of a child inhabits multiple properties, courts look to which location serves as a "home base" when determining the child's residence for purposes to attending school. *Connelly*, 445 N.E.2d at 481.

The Plaintiff alleges that the Debtor, and therefore her children, resided in Burbank, Illinois and not in Chicago, Illinois, during the years 2006 to 2013 and consequently were not qualified to receive a tuition-free education in the Chicago Public Schools.

In making her recommendation, the hearing officer extrapolated from scant evidence that the Debtor resided in Burbank during the 2013 school year and earlier. She relied on the six observations of the Burbank Property in 2013 and the Debtor's presence in the Burbank Property during the 2009 raid in determining that the Debtor had resided in Burbank since 2006. The hearing officer disregarded the testimony of any witness who knew the Debtor personally and overlooked the OIG's failure to observe the Chicago Property at any point in time. There is no indication that the hearing officer made any inquiry into which property served as the debtor's "home base" or that the officer even understood that a higher burden existed for attempting to show a change in residence.[8]

Most importantly, the hearing officer also made no inquiry into the Debtor's intent as to what her residency was. The hearing officer stated that she did not find the Debtor to be a credible witness on the grounds that she did not believe that the Debtor would chose to reside in a multi-generational living situation while making a healthy salary and owning a home in the suburbs. That

---

[8]    The hearing officer's analysis fails to consider the possibility that the residence of the Debtor was not continuous from 2006 to 2013 or that the Debtor and her husband could have had different residences during the same period. Compl., Exh. A. It appears that the hearing officer failed to account for their physical separation or any living arrangement other than a married couple living in the same home, sleeping in the same bed. *Id.*

conclusion is shockingly narrow-minded given the demonstrable challenges with which the Debtor was faced. It failed to take into account customary living situations and the complexities of family life, especially in light of Mr. Monarrez's medical and legal difficulties. Furthermore, as collateral estoppel does not apply to the finding of noncredibility, there is no preclusive effect on the Debtor's testimony regarding what she intended as her residency, a critical element of determining residency. *Connelly*, 445 N.E.2d at 481.

Given that Illinois law requires an inquiry into the Debtor's intent, the Debtor's testimony in that regard bears special importance.

At the Trial, the Debtor testified that upon moving back to Illinois from Louisiana in 2001, she moved back into the home of her in-laws in the Pilsen neighborhood in Chicago, the Chicago Property. Tr. at p. 235, June 13, 2018. She testified that her reasoning for moving back in with her in-laws, despite her livable salary as a teacher, was that she received help with child care and her children were exposed to Spanish language speakers, which she saw as a benefit to them. *Id.* at p. 237. The Debtor fulfils both prongs of the residency test with respect to her move to the Chicago Property in 2001. First, the Debtor established a physical presence in the Chicago Property in 2001. Second, the Debtor established that she had an intent to remain in the Chicago Property. The Plaintiff presents no evidence to refute this.

In order to establish the Burbank Property as the Debtor's residence, the Plaintiff would have had to demonstrate that the Debtor renounced the Chicago Property as her residence. *Park v. Hood*, 27 N.E.2d 838, 842 (Ill. 1940). Courts have held that a person's actions are more persuasive than their testimony on this subject. *Connelly*, 445 N.E.2d at 480. The Plaintiff relied on the Debtor's presence during the 2009 raid of the Burbank Property, along with her presence at the Burbank Property during the 2013 surveillances performed by the OIG, as evidence that the Debtor renounced her residence at the Chicago Property. However, her mere presence at the Burbank Property does not satisfy the Plaintiff's burden to show by a preponderance of the evidence that the Debtor had the intent to renounce the Chicago Property as her residence, much less when that renunciation and resulting change in residence occurred.

The Plaintiff also pointed to the Debtor's tax returns as evidence that the Debtor resided in Burbank. The Debtor claimed a property tax exemption for the Burbank Property each year from 2011 to 2015. The Debtor explained at the Trial that she had filed the tax returns jointly with Mr. Monarrez, who was residing at the Burbank Property, and took the exemption thinking that her husband's residence at the Burbank Property qualified them to do so. Tr. at. p. 95, June 12, 2018.[9]

In addition to tax returns, the Plaintiff contended that parking stickers used for the Debtor's car indicate that she was a resident of Burbank. The Debtor testified at the Trial that her husband had obtained the parking stickers using her name for the cars, as he was residing in Burbank. *Id.* at p. 97. Given that the Debtor regularly spent time at the Burbank Property, where she often had to park on the street, the Burbank parking stickers on her vehicles are insufficient evidence to establish that she had renounced the Chicago Property as her residence or establish that she was using the Burbank Property as her "home base." Tr. at p. 248, June 13, 2018. Additionally, the Plaintiff

---

[9]      At least two of the same tax returns that the Plaintiff provided for proof that the Debtor resided in Burbank were provided by the Debtor to establish that she resided in Chicago. As discussed below, the Debtor provided her 2011 and 2013 tax returns, which listed her address as the Chicago Property.

pointed to ATM withdrawals made by the Debtor in the Burbank neighborhood. Similar to the parking stickers, this is evidence that the Debtor was at times present in the Burbank neighborhood, perhaps even regularly, but it is not convincing evidence of the Debtor's residence as a matter of law.

The Plaintiff also tendered a 2004 mortgage agreement in an attempt to establish abandonment of the Chicago Property. The Debtor took out four mortgages on the Burbank Property. The mortgage agreement the Debtor took out in 2004 states that, "Borrower shall occupy, establish, and use the Property as the Borrower's principal residence…." PX No. 14, at p. 3. However, the Debtor testified that she signed the agreement without reading it in its entirety, as so many people unfortunately do. Tr. at. p. 135, June 12, 2018. The Debtor is not an attorney and did not have an attorney present at the signing of the mortgage agreement. *Id.* While the Plaintiff argues that the Debtor is not an unsophisticated person because she is a teacher and served as a union representative for the teacher's union, her employment as a teacher does not necessarily translate into an ability to read and understand every provision in a mortgage agreement. The Debtor instead testified that she did not understand everything in the mortgage agreement, including the portion which requires her to use the Burbank Property as her main residence. *Id.* While on its face, the mortgage agreement does stand for the proposition that the Debtor was contractually obligated to reside at the Burbank Property, it tells us little about what she actually used as her "home base."[10] The mortgage agreement alone, then, is not convincing evidence that the Debtor intended to abandon the Chicago Property as her residence.

The Debtor testified that she kept her and her children's clothing at the Chicago Property, save for a spare set in case of spills, that she did laundry at the Chicago Property, that she kept bicycles and school supplies for her children at the Chicago Property, and that the family dog resided at the Chicago Property. Tr. at. p. 278, June 13, 2018. This demonstrates that the Debtor continued to use the Chicago Property as the "home base" for herself and for her children. And while the Plaintiff questioned why a teacher making a substantial salary would choose to live in close quarters with her extended family when she owns a property outside of the city, the Debtor explained that the Chicago Property provided a more supportive community environment in which to raise her children than the Burbank Property did.

The Debtor also provided documents on which she stated her address as being the address of the Chicago Property over many years. The Debtor provided tax returns for the years 2002, 2006, 2007, 2008, 2009, 2010, 2011 and 2013, which state her address as the address of the Chicago Property. DX No. 2. The Debtor provided birth certificates for her two youngest daughters on which she listed her address as the Chicago Property. DX Nos. 5, 6. The Debtor also listed her address as being the Chicago Property on bank statements from 2004 to 2013. DX No. 10.

The Plaintiff must demonstrate the existence of a debt by a preponderance of the evidence, which means that the Plaintiff must prove the Debtor's residence was outside the City of Chicago from 2006 to 2013. The Plaintiff produced evidence of the 2009 raid, the 2013 observations of the Burbank Property, evidence that the Debtor withdrew money in Burbank and claimed a property tax

---

[10]   Given that Mr. Monarrez resided at the Burbank Property, it is unclear if the Debtor's residing elsewhere would even be considered a true breach of the mortgage agreement. If so, every couple who was separated and living separately but who were jointly obligated on a mortgage would breach the terms of the mortgage by their separation.

exemption in the Burbank Property. Meanwhile, the Debtor provided copious amounts of evidence—financial documents, filings with the state and federal documents—that provide the Chicago Property as her home address. While the court understands that these are proffered in the interest of the Debtor, the court, most importantly, found the Debtor to be honest and credible in her testimony. Finally, the Plaintiff provided little to no support to demonstrate the Debtor's intended residency was anything but the Chicago Property.

The weight of the evidence and the legal presumptions both favor the Debtor. The Plaintiff does not lack evidence to support its contention, but the Debtor has presented a better case. It is clear to the court that the Debtor established the Chicago Property as her residence as early as 2001 and never had the requisite intent to change that residence. Excluding intent, the evidence of the Debtor's residence after 2005 is, at best, mixed and the presumptions favor the Debtor. As she resided in Chicago, so did her children. 105 ILCS 5/10-20.12b(a)1. As a result, no debt is owed.

The court therefore finds that the Plaintiff has failed to carry its burden of showing that the Debtor renounced the Chicago Property as her residence any time before 2014. The Plaintiff has failed to show that the Debtor owes the Plaintiff a debt, a gating requirement of section 523(a)(2)(A).

b.    *Intent*

While the Plaintiff's claim as it has not demonstrated that a debt existed, *see Zirkel*, 1999 WL 294879, at *7, given the Plaintiff's position that the inquiry was precluded, out of an abundance of caution, the court considers the question of intent—something clearly not considered in the proceeding before the Board's employees. *Scienter*, or intent to deceive, is a required element under section 523(a)(2)(A), whether the claim is for a false pretenses, false representation, or actual fraud. *Mayer*, 51 F.3d at 673; *Pearson*, 339 B.R. at 919.

Intent to deceive is measured by a debtor's subjective intention *at the time of* the representations or other purportedly fraudulent conduct. *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (Squires, J.); *see also CFC Wireforms v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004) (Schmetterer, J.). An intent to deceive may be established through direct evidence or inference. *Monroe*, 304 B.R. at 356 (*citing In re Sheridan*, 57 F.3d 627 (7th Cir. 1995)). Because direct proof of fraudulent intent is often unavailable, fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (Cox, J.) (internal quotations omitted). Thus, "[w]here a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315.

The Plaintiff alleges that the Debtor intended to misrepresent her residence so that her children could attend Chicago Public Schools tuition-free. In order for the court to find this, the court must find that: (i) the Debtor believed her legal residence was outside of the City of Chicago; *and* (ii) the Debtor, with the intent to deceive, reported an address in the City of Chicago when enrolling her children in the Chicago Public Schools. Put another way, it is possible for the Debtor to have believed her residence to have been the Chicago Property even if, as a matter of law, it was not, and the Plaintiff has not addressed this.

Had the Plaintiff shown the existence of a debt it must still have met these requirements. It did not. As *scienter* is a required element of false pretenses, false representation and actual fraud, without proving intent, the Plaintiff cannot satisfy its burden under 523(a)(2)(A). The Plaintiff did not provide any direct evidence regarding the Debtor's intent.

The totality of the circumstances also does not support drawing an inference of intent to deceive. The Plaintiff's evidence established that the Debtor owned a home in Burbank, but does not speak to her understanding of her place of residence. Without establishing that the Debtor was aware that she legally resided in Burbank, the Plaintiff has not carried its burden of showing that she intentionally misrepresented her residence.

Instead, the Plaintiff attempted to discredit the Debtor generally. The Plaintiff pointed to the Debtor's testimony that she presigned her bankruptcy schedules despite having indicated that she had read them first. Tr. at. p. 127, June 12, 2018. In addition, the Plaintiff argued that the Debtor's testimony is not credible because she admits to signing her mortgage agreements without reading them. These acts, though concerning, do not detract from Debtor's testimony with regard to her marriage, her living situation and her family life generally.

The Debtor's testimony regarding what she knew about her residency was credible and her explanations are plausible. The court detected no *indicia* of dishonesty or deceit while the Debtor discussed her marriage, her living situation or her motivation for enrolling her children in Chicago Public Schools. The testimony was candid, even when it crossed into personal issues most would want to keep private. Further, that testimony has other evidence to support her claimed circumstances. Debtor's Exhibit Nos. 20, 21 and 22, the BlueCross and BlueShield statements issued to the Debtor, corroborate the Debtor's testimony regarding her husband's ongoing health issues,[11] and Plaintiff's Exhibit No. 26 corroborates her testimony regarding his legal problems. The Debtor's repeated use of the Chicago Property on nonschool related official documents suggest that she understood it to be her address.

The Plaintiff failed to establish that the Debtor knew her legal residence to be outside of the City of Chicago, or that the Debtor purposefully misrepresented her residence to the Plaintiff. The court cannot conclude that the Debtor's enrollment of her children in the Chicago Public Schools was done with fraudulent intent. The overall facts and circumstances as presented by the Plaintiff do not, therefore, carry the Plaintiff's burden. The weight of the evidence, as determined by the court, does not satisfy the preponderance of the evidence standard imposed on the Plaintiff with respect to the existence of a debt or with respect to the required intent of the Debtor under any theory articulated in section 523(a)(2)(A).[12]

---

[11]    While the Plaintiff objected to Debtor's Exhibit Nos. 20, 21 and 22 during the Trial on the basis of foundation and relevance, the court overruled the foundation objection based on the default admission of the Plaintiff for failure to respond to the Debtor's First RTA, *see supra note 4*, subject to the court's determination of relevance and weight. Tr. at pp. 264-68, June 13, 2018. The court now deems Debtor's Exhibit Nos. 20, 21 and 22 relevant to support the Debtor's husband's medical issues.

[12]    The Debtor raised as a defense the theory that the alleged debt was in fact contractual in nature, as it might have been owed irrespective of intentional misconduct had the Debtor sent her children to Chicago schools as a nonresident but with the Plaintiff's consent. That argument was not fully developed by either the

## CONCLUSION

For the foregoing reasons the court finds that the Plaintiff has failed to carry its burden under section 523(a)(2)(A). As a result, judgment in favor of the Debtor will be rendered on the one count of the Complaint.

Dated: August 6, 2018

ENTERED:

_____
Timothy A. Barnes
United States Bankruptcy Judge

---

Debtor or the Plaintiff in response. In light of the conclusions above, the court sees no reason to delve into that issue.